IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RITA MEDICAL SYSTEMS, INC.,<br><br>  Plaintiff,<br><br> v.<br><br>RESECT MEDICAL, INC., and STEVEN DANIEL,<br><br>  Defendants.<br>_____ / | No. C 05-03291 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL** |

**INTRODUCTION**

In this action between manufacturers of medical products, both plaintiff Rita Medical Systems, Inc. and defendants Resect Medical, Inc., and Steven Daniel move for partial summary judgment. Defendants also move for partial summary judgment as to plaintiff's prayer for an injunction compelling assignment of the property rights involved. Defendants have shown that there are no triable issues of fact in plaintiff's claims for breach of fiduciary duty, trade-secret misappropriation, and false designation of origin. Those claims must now be eliminated from the case. There still exist, however, triable issues of fact concerning plaintiff's claims for breach of contract, intentional interference with prospective economic relations,

1  breach of covenant of good faith and fair dealing, and unfair competition.  For the same reason,
2  defendants have not excluded all triable issues of fact as to whether plaintiff is entitled to an
3  injunction mandating assignment.  Plaintiff has also filed a motion for summary judgment as to
4  all of its claims except for false designation of origin.  In short, plaintiff's motion for summary
5  judgment is **DENIED**, defendants' motion for summary judgment is **GRANTED IN PART AND**
6  **DENIED IN PART,** and defendants' motion for partial summary judgment of plaintiff's request
7  for injunction mandating assignment is **DENIED.**

**STATEMENT**

9  This case presents a familiar fact pattern:  an employee leaves one company for another
10 and is accused by the first of stealing trade secrets and other company assets.  Rita and Resect
11 were (and still are) medical device companies who specialized in electrosurgical devices for
12 the treatment of liver tumors.  Rita developed a line of products using radiofrequency (RF)
13 energy to heat a localized area of tissue to destroy it and to cauterize the surrounding blood
14 vessels, preventing excessive bleeding, a process referred to as ablation.  Another process used
15 to treat liver tumors was "ablation-for-resection."  In this process, a planar section of tissue
16 near the tumor was ablated using RF energy.  Another surgical tool was then used to cut along
17 the plane of ablated tissue to remove or resect the tumor.

18 Rita marketed both RF generators and electrosurgical devices designed to be attached
19 to its RF generators.  Rita marketed only ablation devices until August 2005.  At that time, Rita
20 entered into a licensing agreement with a British company, eMcision, to market eMcision's
21 Habib 4X device for use in ablation-for-resection surgeries (Morton Decl. Exh. A 70:20–23;
22 66:24–70:15).  Rita also sponsored and operated a website, www.livertumor.org, that featured
23 a list of hospitals and doctors who operated on liver tumors.  It displayed their contact
24 information, as well as general information about liver tumors.  The list was geared toward
25 displaying doctors and hospitals using Rita products.

26 A year or more before Rita began to do so, Resect began selling an ablation-for-
27 resection device (in April 2004), after it was cleared for sale by the FDA (Daniel Decl. Exh.
28 E).  Resect's device was the InLine Bipolar Coagulator.  The InLine device consisted of a long

2

plastic device with six electrodes spaced in a comb-like fashion along the device; the electrodes could be deployed at varying depths in the organs to be treated (Daniel Decl. ¶ 4). The InLine device was plug compatible with Rita's RF generators (*ibid.*). The InLine device has been distributed in the United States by Erbe USA since September 2005 (Day Decl. ¶ 2).

*Daniel's Employment at Rita.*

Steven Daniel worked for Rita from July 1999 through March 2003, as director of product development. In addition to developing products and making prototypes, Daniel evaluated product concepts from Rita's inventors and reported on his findings to Rita's board of directors and senior staff. They had ultimate decision-making authority on which projects were to be pursued (Stangenes Decl. Exh. L).

Daniel signed an employment agreement upon coming to work for Rita. The agreement required him to keep confidential all company information and to assign the patent rights to any inventions that he developed while at Rita (Andre Decl. Exh. 1). Daniel was not required to assign any inventions that fully qualified under California Labor Code Section 2870, although he was required to inform Rita of any inventions that he thought would qualify under that section (*ibid.*). The agreement also forbade him from soliciting any of Rita's customers, employees, consultants, or licensors for 24 months following the end of his employment (*ibid.*).

Rita involuntarily terminated Daniel on March 11, 2003 (Daniel Decl. ¶ 2). He was not allowed to take anything with him at the time but was allowed to return to collect his personal belongings (Morton Decl. Exh. U). Daniel stated that when he returned, he packed his personal items such as books and reference materials, but left his laboratory notebook in his desk (*ibid.*). Daniel did, however, admit that he inadvertently retained the name and contact number of Nora Herceg, a nurse at the Cleveland Clinic (*ibid.*).

One fact issue concerns whether Daniel removed, copied, or deleted work-related files from his computer. Rita says he did. He says he did not. Another issue concerns Rita's customer list, also allegedly stolen. Daniel declares that he never had access to Rita's customer lists (Daniel Decl. ¶ 5). In the course of his job, he had only limited contacts with

3

1  Rita's clients related to Rita's products (Stangenes Decl. Exh. T 75:12–20). Rita has some
2  proof to the contrary.

3  *Development of the InLine Device.*

4  Another key issue concerns the InLine device and whether Daniel worked on it for Rita
5  rather than on his own time and for his own account. Without question, Daniel worked on its
6  development while still employed at Rita. The issue is whether he is now required to assign
7  his interest in the InLine patent to Rita, as seemingly the employment agreement requires.

8  Dr. David Morris, who was then under a consulting agreement with Rita, presented the
9  concept of the InLine device to Rita in December 2000, but Rita was not interested in
10  developing it at that time (Morris Decl. ¶ 8). Daniel also evaluated Morris' concept, but Rita's
11  former vice president of research and development Daniel Balbierz and Rita's vice president of
12  global marketing Rick Mueninghoff declined to pursue the idea (Morton Decl. Exh. D,
13  136:18–137:10). Daniel testified that at the time he was working at Rita, the company was
14  only interested in ablation devices, not in ablation-for-resection devices (Morton Decl. Exh. B
15  25:24–27:7; Exh. C 32:17–20).

16  Rita disagrees. It states that it had always been interested in any ablation technology
17  but that at the time a comb-type device like the InLine device was considered low priority
18  (Andre Decl. Exh. 3 52:13–19; 65:1–7).

19  In early 2002, Morris told Rita that because Rita would not support his development of
20  the InLine device, he would seek alternate funding sources (Morton Decl. Exh. D 47:9–48:3).
21  He applied for and received a grant from the Australian government (*ibid.*). According to
22  Daniel, around February 2002, Daniel informed his boss Balbierz that he intended to start work
23  on the InLine device with Morris on his own time while he was still working at Rita (Andre
24  Decl. Exh. 8). Balbierz purportedly did not ask for any statement in writing to that effect from
25  Daniel (*ibid.*). Daniel asked for and received from Rita three RF generators that Rita no longer
26  intended to use (*ibid.*). Daniel states that the InLine Device was developed on his own time
27  using his own resources. He says that he assisted Morris in developing the InLine to a limited
28

4

extent. He made all entries regarding the InLine in a separate, personal laboratory notebook that he kept at his home (Morton Decl. Exh. D 142:9–146:25).

Rita disagrees. It states that Daniel developed the InLine device using its time and resources. Specifically, Rita had sent Daniel on trips to Australia to meet with Morris, and during those meetings, Morris and Daniel worked on developing the InLine device (Andre Decl. Exh. 2 45:15–46:20). Rita has not identified when these trips took place.

Daniel and Morris filed provisional patent application No. 60/045,051 drawn to the InLine device in August 2002, prior to Rita's terminating Daniel on March 11, 2003 (Andre Decl. Exh. 11, RFA 8). Daniel did not inform Rita of the application. It was later converted into utility patent application No. US2004/0039429. Daniel and Morris assigned it to Resect (Andre Decl. Exh. 12, 49). This much seems undisputed.

Rita claims that the '429 application was based on one of its patent applications filed on February 28, 2001, that listed Daniel as an inventor. The '429 application, however, does not claim priority to Rita's application, and the Patent and Trademark Office considered Daniel's application to be patentably distinct from Rita's because the '429 application specifically disclosed the spacing of the electrodes (Morton Decl. Exh. R). The '429 application eventually issued as United States Patent No. 7,008,421 in March 2006.

While still employed at Rita, Daniel formed Resect as a Nevada corporation in September 2002, which ended up not doing any business and ultimately was abandoned (Morton Decl. Exh. D 40:11–41:13). Also, Daniel registered the trademark "Resect Medical" and obtained the rights to the internet domain names www.resect.com and www.resectmedical.com (*id*. at 23:3–21). Resect was later incorporated as a Delaware corporation effective April 15, 2003 (*id*. at Exh. S).

Daniel was terminated from Rita on March 11, 2003. Shortly thereafter he began full-time work at Resect. Another fact issue concerns when Resect began its commercial development work with another company called Hantel Technologies. Parties agree that Hantel sent a letter dated March 13, 2003, to Resect about beginning commercial development of the InLine device (Andre Decl. Exh. 36). According to Rita, Resect began developing the

5

1  InLine device in conjunction with Hantel starting in January 2002, and that the letter to Resect
2  dated March 13, 2003, was a response to overtures Resect had previously made to Hantel (*id*.
3  at Exh. 35). Resect disagrees. Mary Pascual-Gallup, Hantel's vice president of regulatory
4  affairs and quality assurance, declares that the schedule to which Rita refers was actually for
5  another project (Pascual-Gallup Decl. ¶ 5). That document was intended to be a draft of the
6  schedule for the development of the InLine device. The dates were from another project, but
7  the document was shown to Resect to show the amounts of time Hantel projected for each
8  phase of development (*ibid*.). She declares that Hantel did not actually start work with Resect
9  until June 2003 (*id*. at ¶ 6). The InLine device was cleared for marketing by the FDA in April
10 2004 (Daniel Decl. Exh. E). Rita's ablation-for-resection device, the Habib 4X, entered the
11 market in August 2005 (Morton Decl. Exh. A 70:20–23).

*Rita's Trade Secrets and Resect's Solicitation Efforts*

In this action, Rita alleges as its trade secret (Stangenes Decl. Exh. A):

> The identity of RITA's current and potential customers and the names and contact information for individual decision-makers within those organization, including, but not limited to Nora Herceg; Roswell Park Cancer Institute (Buffalo, NY); Bassett Healthcare/Mary Imogene Hospital (Cooperstown, NY); Brigham & Women's Hospital (Boston, MA); Norton Hospital (Louisville, KY); and the University of Iowa (Iowa City, Iowa).

In discovery, Rita did not produce a copy of its customer list as it existed at the time Daniel's employment ended. Rita did produce a customer list dated November 14, 2005 (Morton Decl. Exh. P). Darrin Uecker, Rita's chief executive officer, testified that such information was kept on a password-protected database and was updated regularly (Morton Decl. Exh. A 108:25–109:10). Uecker admitted that he did not begin working at Rita until after Daniel left in March 2003 (*id.* at 108:16–20). Rita did not produce any further documents or testimony indicating the contents of Rita's customer list at the time Daniel's employment ended.

In June 2004, Resect marketed the InLine device at a sales booth at the International Hepato-Pancreato-Biliary Association conference. The conference was attended almost exclusively by liver surgeons, general surgeons, and surgical oncologists (Daniel Decl. ¶ 6). Resect's booth had a sign-in sheet for doctors visiting the booth to provide contact information (*id*. at ¶ 7, Exh. B). Dr. Wilkinson of the University of Iowa, Dr. Clancy of Brigham &

6

1  Women's Hospital, and Dr. Kuvshinoff of Roswell Park Cancer Institute were among the
2  doctors who signed in (*ibid.*). Morris declares that Dr. Zuckerman of Bassett Healthcare/Mary
3  Imogene Hospital studied under him in Sydney, Australia (Morris Decl. ¶ 11). Zuckerman
4  participated in a clinical study with Resect, but did not purchase any of Resect's devices
5  (Daniel Decl. ¶ 11).

6  Rita filed this action against defendants on August 12, 2005. This was the same month
7  that Rita entered the ablation-for-resection market via its deal with eMcision. Plaintiff's
8  complaint alleged the following claims: (1) breach of written contract against Daniel, (2)
9  misappropriation of trade secrets against Resect and Daniel, (3) breach of fiduciary duty
10 against Daniel, (4) false association under 15 U.S.C. 1125(a) against Resect, (5) intentional
11 interference with prospective economic relations against Resect and Daniel, (6) breach of
12 covenant of good faith and fair dealing against Daniel, and (7) unfair competition under
13 California Business and Professions Code Section 17200 against Resect and Daniel. An order
14 granting partial summary judgment issued May 18, 2006, holding that only Rita's customer
15 list, and not the configurations of its RF generator device connections and RF generator
16 software could be protectable trade secrets. Rita filed a motion for a preliminary injunction as
17 to its false-association claim which was denied in an order dated July 17, 2006.

18 Both parties now move for summary judgment under Rule 56(c). Plaintiff moves for
19 summary judgment on all claims except for the claim for false association, and defendants
20 move for summary judgment on all claims except breach of written contract against Daniel.
21 Defendants also move for summary adjudication as to Rita's request for assignment of the '429
22 patent.

**ANALYSIS**

24 Summary judgment should be granted where the pleadings, discovery, and affidavits
25 show "that there is no genuine issue as to any material fact and that the moving party is entitled
26 to judgment as a matter of law." FRCP 56(c). The moving party has the initial burden of
27 production to demonstrate the absence of any genuine issue of material fact. *Playboy
28 Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004).

7

Once the moving party has met its initial burden, the nonmoving party must "designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citation omitted).

For the most part, this case is riddled with fact issues for the jury. All counsel herein are prone to overstatements about the record. After a painful sifting of fact from fiction, this order denies all of plaintiff's motion and all but limited aspects of defendants' motions.

### 1.    BREACH OF FIDUCIARY DUTY BY DANIEL.

Both parties move for summary judgment on this claim. "The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." *Slovensky v. Friedman*, 142 Cal. App. 4th 1518, 1534 (2006).

Rita first presents evidence that Daniel's status at the company created a fiduciary duty. Certain relationships give rise to fiduciary duty as a matter of law, including principal-agent relationships, partnerships, joint-venturer relationships, corporate officers and boards of directors and their shareholders, and trustee-beneficiary relationships. *Oakland Raiders v. National Football League*, 131 Cal. App. 4th 621, 632–633 (2005). Both parties agree that Daniel's title at Rita was director of product development and that he supervised a team to help create new products for Rita. Daniel's title alone does not indicate a fiduciary duty because the parties also agree that Daniel was not a member of Rita's board of directors or a corporate officer.

Rita next relies on the fact that Daniel supervised a large number of employees and had an important role in the company to show that he had a fiduciary duty. Plaintiff cites *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1328 (1996), for the proposition that all managerial employees are the company's agents, and from there plaintiff assumes that all managerial employees owe fiduciary duties in their capacities as agents. This assumption extends

1 fiduciary duty much too far. Plaintiff also argues that Daniel had a fiduciary duty because he 2 had decision-making authority, however, plaintiff does not dispute that Rita's officers and 3 board of directors had the ultimate decision-making power as to which product ideas Rita 4 would develop.

5 In general, an employment contract does not indicate the existence of a fiduciary 6 relationship. *Calvao v. Superior Court*, 247 Cal. App. 3d 921, 923 (1988). Additionally, 7 "courts finding no fiduciary duty have done so where other legal duties clearly existed between 8 the parties that covered the transaction in suit and were inconsistent with the existence of a 9 fiduciary duty." *Oakland Raiders*, 131 Cal. App. 4th at 634. Here, the parties do not dispute 10 that Daniel was under an employment contract with Rita. This contract did not clearly indicate 11 that Daniel had a fiduciary duty. The contract did require him to keep Rita's trade secrets 12 confidential, to assign patents, and not to compete with Rita. The agreement he signed both 13 gave him no special status and covered all of the theories of breach of fiduciary duty that Rita 14 asserts. Thus, Daniel did not have a fiduciary relationship by title, by contract, or by special 15 relationship. A reasonable trier of fact could not conclude that Daniel owed a fiduciary duty to 16 Rita. Thus, defendants' motion for summary judgment as to plaintiff's claim for breach of 17 fiduciary duty is **GRANTED**, plaintiff's motion for summary judgment is **DENIED**.

18 **2. TRADE-SECRET MISAPPROPRIATION.**

19 Both parties move for summary judgment on Rita's claim for misappropriation of trade 20 secrets. Originally, Rita had alleged three categories of trade-secret information. An order 21 dated May 18, 2006, held that there were triable issues of fact as to whether Rita's narrowed 22 customer list was a protectable trade secret and granted summary judgment to defendants as to 23 the other two categories of trade secrets Rita had alleged.

24 **A. Existence of a Protectable Trade Secret.**

25 California Civil Code Section 3426.1(d) defines a trade secret as information that "(1) 26 derives independent economic value, actual or potential, from not being generally known to the 27 public or to other persons who can obtain economic value from its disclosure or use; and (2) is 28 subject of efforts that are reasonable under the circumstances to maintain its secrecy." A

9

1  narrowed list of actual and potential customers can be (but is not necessarily) a protectable
2  trade secret because of its economic value to the holder. *Abba Rubber Co. v. Seaquist*, 235
3  Cal. App. 3d 1, 20 (1991).

4  Rita argues, and defendants do not dispute, that Rita took reasonable steps to protect its
5  alleged trade secret information. Rita made all its employees sign confidentiality agreements,
6  Rita's customer list was stored on a password-protected computer network, and Rita's
7  employee handbook stated that its customer lists were some of its most valuable assets. Rita
8  also presents evidence that it invested time and effort in winnowing its larger list of customers
9  down to those that will or have actually purchased its products. Rita started by canvassing
10 physicians and hospitals who treat liver cancer. Then it narrowed the list by investigating to
11 which surgeons physicians were referring patients and asking if those surgeons were interested
12 in ablation technology.

13 Plaintiff and defendants part company as to whether Rita's customer list was
14 protectable as a trade secret. First Rita argues that "this court has already recognized that
15 RITA's customer information constitutes a protectable trade secret" (Pl. Opp. Br. 5). Rita
16 ignores the fact that the prior order on defendants' motion for partial summary judgment held
17 that *for purposes of that order*, Rita's customer list could later be proven to be a trade secret,
18 and that those facts were not deemed established for trial (Stangenes Decl. Exh. B).

19 Defendants argue that the name of Nora Herceg cannot be a trade secret because her
20 name was publicly disclosed in the complaint which was not filed under seal. Plaintiff did not
21 dispute this either at oral argument or in its briefs. The complaint actually identified "Nora
22 Hergen, who in 2002 was an assistant for a surgeon client of RITA" (Compl. ¶ 17). Plaintiff
23 later identified her as Nora Herceg, an assistant at the Cleveland Clinic. Despite this small
24 error, plaintiff has never indicated that the complaint and its later disclosures refer to different
25 people. Plaintiff has also not argued or indicated that there would be any confusion as to the
26 identity of the person named in the complaint. Furthermore, plaintiff presents no evidence that
27 Resect ever contacted the Cleveland Clinic or Ms. Herceg. Because of this, Nora Herceg's
28 name cannot be a trade secret.

10

As to the other names, defendants argue that Rita has never been able to produce the customer list as it existed at the time Daniel left Rita. It has only produced a customer list dated November 2005. That document did not list contact information for doctors or medical personnel, it only listed "accounts receivable" as a contact. The document did not identify any prior purchases that the customer had made. Rita has never produced any other customer list, nor have they produced anyone working at Rita at the time Daniel left to testify to the contents of the list.

Rita explains this by presenting Darrin Uecker, Rita's chief technology officer, who testified that Rita did maintain a list of customer profiles and purchasing information. The list was stored on a frequently-updated computer database and was only printed out as needed. Uecker did not otherwise explain the absence of the list. Uecker testified that if the customers in question were on the list as of November 2005, they would have been customers at the time Daniel's employment ended. Now, Uecker declares that the Cleveland Clinic, Roswell Park Cancer Institute, Brigham & Women's Hospital, Norton Hospital and Bassett Healthcare were all Rita customers before at least January 2003. Despite the glaring absence of documentary evidence of Rita's customer list, a reasonable jury could still rule for either plaintiff or defendants as to whether these hospitals were Rita's clients at the time Daniel left Rita.

### B. Misappropriation.

California Civil Code Section 3426.1 defines misappropriation as the acquisition of a trade secret by someone who knows or has reason to know that it was acquired through improper means, or the disclosure or use of a trade secret without consent by a person who, at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy. Plaintiff has the burden of establishing that defendants misappropriated the alleged trade secrets.

Plaintiff presents evidence that Daniel was in contact with customers during his time at Rita, and that because of this, he knew who Rita's customers were. Daniel declares, however, that he had never seen, nor had he ever been given a customer list during his time at Rita. Additionally, Daniel did not recall speaking with or contacting four of the five contact people

whose identities are allegedly Rita's trade secrets. The fifth was Nora Herceg whose name is not a trade secret. Neither party has eliminated all triable issues of fact as to whether Daniel took the list.

### C. Independent Derivation.

Plaintiff has the burden of establishing that defendants did not independently derive trade-secret information. *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1669 (2003). The sum of the evidence Rita presents in support of this claim shows that Resect and Rita had some customers in common, but falls short of excluding independent derivation. Even viewed favorably to plaintiff, this evidence could not preclude a jury's finding that Resect and Daniel did not independently derive the customer information.

In response, defendants present evidence that they got contact information from Dr. Wilkinson of the University of Iowa, Dr. Kuvshinoff of Roswell Park Cancer Center, and Dr. Clancy of Brigham & Women's Hospital at the IHPBA conference. Plaintiff points to some friendly-sounding emails dated May 2003, between Daniel and Dr. Zuckerman of Bassett Healthcare to show that Daniel must have met Zuckerman before leaving Rita in March 2003. Morris, however, declares that he previously introduced Dr. Zuckerman to the InLine device while Zuckerman was studying surgical techniques under him in Autstralia. Finally, defendants present the declaration of a representative from Erbe USA, distributor of the InLine device, who stated that Erbe, and not Resect initiated contact with Norton Hospital and Bassett Healthcare, and that Erbe had not made any sales to the Cleveland Clinic. Viewing the facts in the light most favorable to the plaintiff, no reasonable juror could find that Resect and Daniel did not independently derive their customer list. Accordingly, defendants' motion for summary judgment as to the claim for trade-secret misappropriation is **GRANTED**.

### 3. FALSE ASSOCIATION.

Defendant moves for summary judgment on Rita's claim for false association under 15 U.S.C. 1125(a). An order on plaintiff's motion for a preliminary injunction dated July 17, 2006, addressed Rita's allegations that Resect was misrepresenting to customers that its products were compatible with Rita's RF generators. The order held that Rita's claim under

12

1  that theory appeared to be unactionable because the FDA had already determined that Resect's
2  products were compatible with Rita's RF generators and had approved them to be marketed as
3  such. Rita does not argue this theory in opposition to defendant's motion for summary
4  judgment. Instead, Rita focuses on confusion in the marketplace arguing that consumers were
5  confused into believing that Resect's products were affiliated with Rita.

6  There are two bases for liability under 15 U.S.C. 1125(a): "(1) false representations
7  concerning the origin, association, or endorsement of goods or services through the wrongful
8  use of another's distinctive mark, name, trade dress or other device ('false association'), and
9  (2) false representations in advertising concerning the qualities of goods or services ('false
10 advertising')." *Waits v. Frito-Lay, Inc.,* 978 F.2d 1093, 1108 (9th Cir. 1992). In its briefs, Rita
11 denies that it is making a claim for false advertising, thus plaintiff must show that there was a
12 false representation as to origin, and that such representation likely confusion, mistake, or
13 deception.

14 Rita has the burden of showing likelihood of confusion, specifically, that its customers
15 would likely believe that the InLine device was affiliated with or sponsored by Rita. Plaintiff
16 presents the declarations of three of its sales representatives. Kevin Nash declares that he
17 spoke with surgeons at the University of Iowa who did not seem to realize that the InLine
18 device was not a Rita product until Nash told them otherwise (Sun Decl. Exh. 3 ¶ 7). Ryan
19 Bliss declares that "Resect's representations regarding the compatibility of the InLine device
20 with RITA's RF generators have caused actual confusion amongst some of RITA's customers,
21 who mistakenly believe that RITA is affiliated, endorses, and/or supports Resect's InLine
22 device" (*id.* at Exh. 4 ¶ 7). The same paragraph appears verbatim in the declaration of Tony
23 Sutton (*id*. at Exh. 5 ¶ 8). Unfortunately for Rita, none of this evidence is admissible and
24 defendants' objection as to that evidence is **SUSTAINED**. Nash's declaration cannot be used to
25 prove that customers were in fact confused as to the origin of the InLine device because that
26 would be hearsay under FRE 702. The same goes for Bliss' and Sutton's declarations. Thus,
27 Rita has presented no admissible evidence that customers were confused into thinking that the
28 InLine device was a Rita product. Because of this, even viewing the evidence in the light most

13

favorable to plaintiff, no reasonable jury could find that customers were confused. Accordingly, defendants' motion for summary judgment on this claim is **GRANTED**.

## CONCLUSION

For all the above-stated reasons, defendants' motion for summary judgment for trade-secret misappropriation, breach of fiduciary duty, and false designation of origin is **GRANTED**. Plaintiff's motion for summary judgment for breach of contract is **DENIED**. Both plaintiff's and defendants' motions for summary judgment on the remaining claims are **DENIED**. Defendants' motion for partial summary judgment of injunction mandating assignment is **DENIED.**

**IT IS SO ORDERED.**

Dated: January 2, 2007

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

14